**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**LISA LEWIS,**

**Plaintiff,**

**v.**

**SCOTT BESSENT,**

**Defendant.**

**Civil Action No. 25-1554 (JEB)**

**MEMORANDUM OPINION**

Plaintiff Lisa Lewis, who has worked for the Office of the Comptroller of the Currency for over twenty years, has long been dissatisfied with her conditions of employment. In 2020, she brought suit here alleging retaliation and a hostile work environment under Title VII and the Age Discrimination in Employment Act. That suit was dismissed. This time around, she offers a variation on that theme, again citing the ADEA and bringing claims of discrimination and retaliation. According to her, after a colleague's retirement, her supervisor decided to redistribute the work in Lewis's unit to accommodate the departure. As a result, he assigned Lewis a new slate of responsibilities. Around that same time, her supervisor also failed to timely grant her request to participate in Toastmasters Club meetings, prompting her to miss out on four of them. The Government has now moved to dismiss. As not every workplace gripe amounts to a colorable discrimination claim, the Court will grant the Motion.

## I. Background

The Court chronicles the relevant facts in the Complaint in the light most favorable to Plaintiff, as it must on a motion to dismiss. Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000). It also relies, as it may without converting the Motion into one for

summary judgment, on documents "incorporated by reference in the complaint, or documents upon which [Lewis's] complaint necessarily relies." Thomas v. Pompeo, 438 F. Supp. 3d 35, 40 (D.D.C. 2020) (quotation marks and citation omitted); see EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997). Those documents include the EEOC counselor's report, produced after Plaintiff filed a request for informal counseling with the EEOC. See ECF Nos. 42-1 (EEOC Report); 30 (Third Am. Compl.), ¶¶ 38, 39, 42, 50 n.4, 63, 64, 85, 93. Finally, the Court takes "judicial notice of other cases including the same subject matter or questions of a related nature between the same parties." Veg–Mix, Inc. v. U.S. Dep't of Agric., 832 F.2d 601, 607 (D.C. Cir. 1987) (citation omitted).

A. Factual Background

For the past twenty years, Plaintiff has worked as a Personnel Security Specialist (PSS) at the Office of the Comptroller of the Currency. See Third Am. Compl., ¶¶ 3, 5, 17, 19. She was 59 years old at the time of the events underlying this suit. Id., ¶¶ 3, 19. Her unit at OCC is small: it comprises seven employees and one supervisor. Id., ¶ 12. Lewis and her supervisor are no strangers; indeed, they have a long history together. In the past ten years, she has filed multiple complaints with the EEOC against him. Id., ¶ 39. She has also filed numerous lawsuits based on his conduct, id., including one alleging that he discriminated against her because of her age, retaliated against her for protected activity, and created a hostile work environment, which was dismissed by then-District Judge Florence Pan in 2021. Lewis v. Yellen, 2021 WL 5416634, at *3 (D.D.C. Nov. 19, 2021).

Plaintiff's present lawsuit reprises substantively similar allegations. To understand them, some background on the nature of her work is in order. Lewis's unit is responsible for conducting the background checks that are familiar to anyone who has sported a federal

employee badge. See Third Am. Compl., ¶¶ 9–10. The work involved in those checks can be broken into two parts: investigation initiation and adjudication. Id., ¶¶ 13–14. Initiating an investigation is mainly a rote task; it requires a PSS to fill out forms with a potential employee's personal information, such as social-security number, and then send them off to other agencies for initial processing. Id., ¶¶ 13, 21, 30. Investigation initiation can involve either initiating a new case for a new potential employee or reinvestigating an old employee every five years. Id., ¶¶ 13, 21. For brevity, the Court will refer to both tasks as investigation initiation. Adjudication, conversely, is a more dynamic exercise that involves using one's judgment. Id., ¶¶ 13, 15–16, 21, 29. It requires the PSS to apply the governing rules and regulations to the other agency's investigative findings to make a recommendation about whether someone should be cleared for employment. Id., ¶ 13. For that reason, adjudication is considered to be more "prestigious," cultivating skills that create more opportunities for advancement. Id., ¶¶ 15, 29.

Historically, Plaintiff and two other employees shared the task of initiating investigations. Id., ¶ 23. In addition to this role, Lewis adjudicated them, a task she had been doing for twenty years. Id., ¶¶ 17–18. Everything changed, however, when, in response to one employee's retirement, Plaintiff's supervisor "reshuffled the entire office's workload and redistributed [it] from scratch." Id., ¶ 18; see id., ¶ 23. When the shuffling ceased, Lewis had been stripped of her adjudication tasks; those responsibilities were shifted to two of the youngest people in the office. Id., ¶¶ 18–20. One had no prior adjudication experience, while the other had worked as a PSS for only five years. Id., ¶¶ 25, 27, 34. Plaintiff, conversely, was now tasked with juggling the entire case-initiation workload, which was typically handled by three people on new investigations and three on reinvestigations. Id., ¶¶ 18–20. As a result of these events, Lewis's work "now takes much more time," and her day-to-day job is far more "boring," comprising

largely "dead-end" administrative duties. Id., ¶¶ 30–33. Lewis tried to raise these concerns with her boss. Id., ¶¶ 35–37. But he rejected her request for reconsideration, explaining that he knew she was unhappy but that the situation would be temporary until the newly vacant spot was filled. Id., ¶¶ 35–37.

Allocation of labor, however, was not the only problem in Lewis's working life. Id., ¶¶ 45–48. A month earlier, her supervisor failed to approve her request to attend a training hosted by Toastmasters International. (Toastmasters is a club focused on helping people learn the art of public speaking. See Toastmasters International, About, www.toastmasters.org/about.) Only after Lewis sent the request three times and explicitly asked if it was being denied did the supervisor approve it. See Third Am. Compl., ¶ 49. He explained that he mistakenly thought he had already approved the request. Id., ¶ 50. As a result of the delay, Plaintiff missed out on four sessions devoted to public speaking and effective communication. Id., ¶¶ 51–58. Lewis's colleagues, including the younger ones, never experienced rejection or delay in getting their training requests approved. Id., ¶ 61.

Right after the reshuffling occurred, Plaintiff sought informal counseling with the EEOC, raising the work-reallocation issues, the Toastmasters incident, and others, and alleging that her supervisor was discriminating and retaliating against her. Id., ¶ 36; EEOC Report at ECF pp. 27–28. In response, the EEOC counselor interviewed Lewis's supervisor. See EEOC Report at ECF p. 27. The supervisor explained that he had altered Plaintiff's tasks because (1) she made mistakes in hard adjudication cases, requiring her work to be redone, (2) her colleagues — which the report describes as the "other employees" and then, two sentences later, as "the younger people" — wanted to get new opportunities and "approach[ed] him for additional work," and (3) he needed to address the gaps associated with their colleague's retirement. Id. at ECF p. 29. As

for the Toastmasters incident, the supervisor explained that he did approve her request and indeed had approved her requests to be a member of the Toastmasters Club for the past ten years. Id. at ECF p. 7.

About six months after Plaintiff filed her EEOC grievance, the federal government began a substantial reduction in workforce. See Third Am. Compl., ¶ 68. Lewis was offered a buyout, which she decided to accept. Id., ¶ 69. She proposed that she leave her job on December 31, 2025, but her supervisor rejected that request, proposing instead September 30. Id., ¶ 70. So Lewis decided that she had no reasonable choice but to stay. Id., ¶ 75.

B. Procedural Background

Plaintiff then filed this lawsuit against Treasury Secretary Scott Bessent on May 15, 2025, bringing various employment-discrimination claims. See ECF No. 1. Over the course of nearly a year, Plaintiff, proceeding *pro se*, amended her Complaint three times. See ECF No. 28 at 2 (summarizing amendments). Now armed with counsel, she has winnowed her case down to three counts for age-based discrimination and retaliation in this Third Amended Complaint. See Third Am. Compl., ¶¶ 77–98.

She alleges that her supervisor discriminated against her in violation of the ADEA by assigning her mindless work and failing to approve her Toastmasters request in a timely manner (Count I). Id., ¶¶ 77–82. She also brings retaliation claims under the ADEA and Title VII (Counts II and III). She alleges that the aforementioned behavior and the denial of her request to leave on December 31 were all retaliatory acts taken in response to the many EEOC complaints Plaintiff has filed against her supervisor for age, race, and sex discrimination. Id., ¶¶ 83–98. Defendant has now moved to dismiss with prejudice. See ECF No. 36 (MTD).

## II. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted." In evaluating a Rule 12(b)(6) motion, the court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow, 216 F.3d at 1113 (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)). A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The court need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint. Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)). The facts instead "must be enough to raise a right to relief above the speculative level" even if "recovery is very remote and unlikely." Twombly, 550 U.S. at 555–56 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

Finally, the court may dismiss a complaint under Rule 12(b)(6) with or without prejudice, but "[t]he standard for dismissing a complaint with prejudice is high." Rollins v. Wackenhut Servs., Inc., 703 F.3d 122, 131 (D.C. Cir. 2012) (quotation marks and citation omitted). It should be granted "only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." Belizan v. Hershon, 434 F.3d 579, 583 (D.C. Cir. 2006).

## III. Analysis

Before diving into the meat of the analysis, the Court addresses the threshold question of exhaustion.

### A. Exhaustion

A plaintiff bringing Title VII or ADEA claims must first exhaust her administrative remedies. Niskey v. Kelly, 859 F.3d 1, 5 (D.C. Cir. 2017); Cureton v. Duke, 272 F. Supp. 3d 56, 63 (D.D.C. 2017). This requirement "applies to all discrete acts of discrimination or retaliation." Nurriddin v. Goldin, 382 F. Supp. 2d 79, 92 (D.D.C. 2005). For Title VII claims, a litigant fulfills that requirement by seeking assistance from an EEOC counselor within 45 days of the alleged incident and then filing a formal complaint. Niskey, 895 F.3d at 5–6; 29 C.F.R. § 1614.105. For ADEA claims, a litigant has two potential avenues for checking the exhaustion box: she may follow Title VII's process, or she may directly file suit in federal court. Lawson v. Sessions, 271 F. Supp. 3d 119, 133 (D.D.C. 2017). A litigant who opts for the latter route must first notify the EEOC within 180 days "after the alleged unlawful practice occurred" and at least 30 days before filing the suit. See 29 U.S.C. § 633a(d). "But if the employee chooses the administrative path, she must complete the administrative process, and the Court may dismiss any unexhausted claims." Cureton, 272 F. Supp. 3d at 63 (internal citation omitted).

The Government asks this Court to dismiss the portions of Lewis's retaliation claims that are predicated on her supervisor's rejection of her proposed separation date for failure to exhaust. See MTD at 12–14. Although Plaintiff refers in her Complaint to discussions she had with an EEOC counselor about her allegations based on the work reallocation and Toastmasters incident, see Third Am. Compl., ¶¶ 42–43, 63, she admits that she did not raise to the EEOC her allegations relating to the proposed separation date. See ECF No. 40 (Opp.) at 31. Additionally,

"[P]laintiff does not claim, and the record does not show, that she filed an intent-to-sue notice with the EEOC, let alone one within 180 days of the alleged unlawful practice" of rejecting her proposed separation date. Cureton, 272 F. Supp. 3d at 63. As such, the Court will dismiss the portions of Lewis's retaliation claims that are predicated on those allegations. Only the arguments based on the work reallocation and the Toastmasters incident survive.

B. Merits

Not for long, however, as the Court finds that Lewis does not plausibly allege ADEA discrimination, ADEA retaliation, or Title VII retaliation.

1. *ADEA Discrimination*

To state a claim for discrimination under the federal-sector provision of the ADEA, see 29 U.S.C. § 633a(a), Lewis must allege that (1) she suffered an "adverse employment action," Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008), and (2) "age discrimination play[ed] a[] part" in that action. Babb v. Wilkie, 589 U.S. 399, 406 (2020). The parties dispute what constitutes an "adverse action" for purposes of that provision. See MTD at 6–9; Opp. at 2–5. Defendant argues that Lewis may bring a claim based only on adverse "personnel actions," as defined by the Civil Service Reform Act of 1978. See MTD at 7. Lewis, conversely, contends that the Court must apply the standard from the Supreme Court's Title VII decision in Muldrow v. City of St. Louis, Missouri, 601 U.S. 346, 355–56 (2024), which requires only that she allege that she experienced "some harm" to the conditions of her employment. See Opp. at 2–3.

Who has the better of the argument turns out to be a nuanced question. In the Title VII context, district courts in this circuit have repeatedly rejected the Government's argument. See, e.g., Desmarais v. Wright, 2026 WL 523022, at *4 (D.D.C. Feb. 25, 2026); Rhone v. Rubio, 2025 WL 3017791, at *4 (D.D.C. Oct. 28, 2025); Stewart v. U.S. Dep't of Agric., 2024 WL

4332618, at *4 (D.D.C. Sept. 27, 2024); Doe v. Austin, 2024 WL 864270, at *9 (D.D.C. Feb. 29, 2024). It remains an open question, however, whether the Government's argument has force in the ADEA context. Cf. Van Horn v. Del Toro, 2024 WL 4381186, at *2 (D.C. Cir. Oct. 3, 2024) (applying Muldrow's "some harm" standard to evaluate ADEA claims based on defendant's concession that plaintiff's "transfers were viable personnel actions under the ADEA"). The Court ultimately determines that it may leave this quagmire for another day. Even assuming for the sake of argument that Muldrow's "some harm" standard applies to federal-sector ADEA claims, Plaintiff's allegations do not satisfy it.

Start with Lewis's allegations concerning the reallocation of work in her office. She alleges that her supervisor's decision to give her the whole investigation-initiation caseload inflicted two harms on her: (1) it reduced her opportunities for promotion, as it deprived her of prestigious tasks that are key to advancement; and (2) it increased her workload, as initiations used to be handled by two or three people. See Third Am. Compl., ¶¶ 28–32. As for the first assertion, Plaintiff acknowledges that she has over twenty years of experience doing adjudications — far more than her colleagues in her unit. Id., ¶¶ 19, 25, 27, 40. She thus never plausibly explains how losing out on the chance to do yet another adjudication could harm her promotion potential. Indeed, Plaintiff has not identified any concrete promotion opportunities that would be affected by the fact that she is currently working only investigation initiations. Cf. Compl., ¶ 41.

As for the second, Lewis never plausibly alleges how the increase in investigation-initiation work has harmed her. She vaguely notes that she has a "larger workload than before" on a day-to-day basis, given that she now handles all investigation initiations (plus some other miscellaneous duties), whereas that work was previously handled by multiple people. Id., ¶¶ 20,

23; see also Opp. at 8 ("Lewis alleged that her daily workload increased."). But "not everything that happens at the workplace" is actionable discrimination, and it is common for employees' workloads to wax and wane in response to changes or challenges. Chambers v. D.C., 35 F.4th 870, 874 (D.C. Cir. 2022) (*en banc*). As such, a larger workload, standing on its own, is not necessarily "some disadvantageous change" to one's working conditions. Muldrow, 601 U.S. at 354 (quotation marks and citation omitted). Instead, as district courts in this circuit have repeatedly held, the larger workload must inflict "some harm" on the plaintiff, such as by lengthening her working hours. See, e.g., Ajisafe v. Gov't of the D.C., 2026 WL 710212, at *7 (D.D.C. Mar. 13, 2026) (finding "some harm" standard met where new "job responsibilities" caused plaintiff to "work unpaid overtime, including overnight," causing sleep deprivation) (quotation marks omitted); Rhone, 2025 WL 3017791, at *7 (same where "increased workload" caused plaintiff to "work weekends without pay"); cf. Chien v. Sullivan, 313 F. Supp. 3d 1, 17 (D.D.C. 2018) (finding retaliation claim viable where plaintiff was assigned more days to be on standby during her days off). Plaintiff's Complaint, however, falls well short on the specifics, as she does not allege that the larger workload has lengthened her workday, caused her to work weekends, or in some other way materially affected the amount of time that she is working in a given week. See Nichols v. Vilsack, 2015 WL 9581799, at *11 (D.D.C. Dec. 30, 2015) ("Plaintiff merely alleges that she was given a larger workload. She does not allege that she, as a result, was required to work longer hours.").

The Complaint also lacks sufficient factual context for the Court to infer that Plaintiff is now working longer hours. Cf. Opp. at 22 (urging Court to "impl[y]" [*sic*] from her Complaint that her workload doubled). For instance, although the Court takes as true that Lewis's investigation-initiation workload has increased, she also alleges that she was taken off

adjudications at the same time. See Third Am. Compl., ¶ 18. That work presumably took up a good deal of her workday before, given that it was the more "difficult" and involved task and was one of her "core professional duties." Id., ¶¶ 15, 18, 24. Aspects of her Complaint thus cut against the inference that her workweek or workdays are now longer. Cf. Ho v. Garland, 106 F.4th 47, 54 (D.C. Cir. 2024) ("[W]e must read the allegations of the complaint as a whole.") (quotation marks omitted). Nor does she allege that her new workload is so "burdensome" as to be "crushing" — or anything else that would give some context to her allegations. Bain v. Off. of Att'y Gen., 648 F. Supp. 3d 19, 56 (D.D.C. 2022); cf. Mogenhan v. Napolitano, 613 F.3d 1162, 1166 (D.C. Cir. 2010) (finding retaliation claim viable where employer "increased [plaintiff's] workload to five to six times that of other employees"). The Court therefore cannot conclude that Lewis's working hours have been materially altered.

At most, then, Plaintiff's allegations support the conclusion that the nature of her workload has changed: it is now "quantity over quality," as she puts it. See Third Am. Compl., ¶ 32. She contends that her workday now involves tending to "time-sensitive tasks that require[] frequent attention and toil" and that are more "mundane" and "boring." Id., ¶¶ 28, 33. Yet the mere reassignment of duties — no matter how boring or tedious — is not alone sufficient to establish an adverse action, even under Muldrow's "some harm" standard. Ahuruonye v. United States Dep't of Interior, 2026 WL 983087, at *14 (D.D.C. Apr. 13, 2026) (finding "some harm" standard not met where plaintiff alleged he was "stripped of . . . management job duties" and given "data entry tasks" but his "work schedule," pay, etc. remained unchanged); Williams v. D.C., 2025 WL 958221, at *4 (D.D.C. Mar. 31, 2025) (same where "[p]laintiff's job duties changed to support . . . . changing needs during the COVID-19 pandemic, but her title and compensation remained the same"). That is especially so here, where the duties at issue fall well

within those expected of a PSS at Lewis's grade level. See Third Am. Compl., ¶¶ 8–14, 22–23. As anyone who has been in the workplace long enough knows, sometimes one is forced to pick up slack or juggle different duties in response to a coworker's leaving the job. See Brodetski v. Duffey, 141 F. Supp. 2d 35, 45 (D.D.C. 2001) ("It is not out of the ordinary for employees to [be] expected to shoulder an extra load on occasion . . . or to [be] asked to step in if there [a]re unexpected staff shortages."). Lewis may be unhappy with that turn of events, but that is not enough; her allegations do not rise to the level of plausibly pleading "some harm" to her working environment.

Her allegations concerning the Toastmasters incident are even more wanting. Lewis alleges that, as a result of her supervisor's initial refusal to approve her requests, she missed four Toastmasters Club meetings. See Third Am. Compl., ¶ 51. She contends that the meetings covered trainings on various aspects of public speaking, a skill she uses "at least weekly at her job." Id., ¶ 53. That, however, does not alone establish that missing the meetings caused "some harm" to Lewis's capacity to do her job or to her working conditions. She does not allege, for example, that these sessions were necessary to help her qualify for promotion or a pay raise. See Ananth v. Turner, 2025 WL 973470, at *10 (D.D.C. Mar. 31, 2025) (finding plaintiff alleged "some harm" to support claim where "program would have equipped her with 349 hours of training and provided her with additional qualifications for a Director-Level GS-15 role") (quotation marks and citation omitted); Stewart, 2024 WL 4332618, at *2, *5 (holding that denying training opportunity that "would have assisted with strengthening [plaintiff's] skill for advancement" constituted adverse action). Instead, she offers only the conclusory allegation that participating in the meetings "would [have] only better[ed] her ability to perform at her

workplace" and helped her continue meeting the expectations for PSS's communication abilities. See Third Am. Compl., ¶¶ 57–60. That does not cut it.

In any event, even if missing these sessions could have in theory inflicted "some harm" on an average employee in Plaintiff's unit, Lewis does not plausibly allege how it could have inflicted harm on her. She has been a member of the Toastmasters Club for ten years. See EEOC Report at ECF 7. It strains credulity to suggest that missing four meeting on the topic of public speaking — out of ten years of such sessions — would have a deleterious effect on Plaintiff's oral skills and thus inflict "some harm" on her conditions of employment.

The Court therefore concludes that neither of Plaintiff's allegations is sufficient to support an ADEA-discrimination claim.

2. *ADEA and Title VII Retaliation*

For much the same reason, Plaintiff's retaliation counts fall by the wayside. "To state a claim for retaliation under Title VII or the ADEA, a plaintiff must plausibly allege that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action by her employer, and (3) the two are causally connected." Spence v. U.S. Dep't of Veterans Affs., 109 F.4th 531, 539 (D.C. Cir. 2024) (quotation marks, citation, and alterations omitted); see Tomasello v. Rubin, 167 F.3d 612, 619 (D.C. Cir. 1999) ("[T]he test for determining retaliation under the ADEA and Title VII is identical.") Action is "material" in the retaliation context if it is the kind of action that could "dissuade[] a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quotation marks and citation omitted).

Although the adverse-action standard for retaliation claims historically "encompass[ed] a broader sweep of actions" than did the discrimination standard, Baloch, 550 F.3d at 1198 n.4,

just the opposite is now true after the Supreme Court's decision in Muldrow. See Flores v. Crown Bldg. Maint., Co., 2024 WL 1795974, at *5 (D.D.C. Apr. 25, 2024); Van Horn, 2024 WL 4381186, at *3 (citing Muldrow, 601 U.S. at 357–58) (noting that the two standards "differ[]"). In other words, the adverse-action standard for retaliation claims is now more demanding than for discrimination claims. As the Court pointed out in Muldrow, conduct is "material[]" for retaliation purposes only if it "causes 'significant' harm." 601 U.S. at 357 (quoting Burlington, 548 U.S. at 68). "[T]rivial harms" will not cut it. Burlington, 548 U.S. at 68.

As Lewis's claims do not survive Muldrow's more modest standard, they certainly cannot clear the hurdle imposed by retaliation's adverse-action standard. Indeed, the D.C. Circuit has long recognized that mere "alteration of job responsibilities," absent "some other adverse change in the terms, conditions, or privileges of employment," does "not rise to the level of adverse action" sufficient to support a retaliation claim. Stewart v. Evans, 275 F.3d 1126, 1135 (D.C. Cir. 2002); see Wiley v. Glassman, 511 F.3d 151, 161 (D.C. Cir. 2007); Taylor v. Solis, 571 F.3d 1313, 1321 (D.C. Cir. 2009); cf. Holcomb v. Powell, 433 F.3d 889, 902 (D.C. Cir. 2006) (finding "reassignment with significantly different responsibilities" commensurate with a position "six grades below" employee's level fundamentally altered job and so was retaliatory) (emphasis added). So, too, it has recognized that only "particularly onerous" increases in workload may support a claim of retaliation. Morales v. Gotbaum, 42 F. Supp. 3d 175, 198 (D.D.C. 2014); Mogenhan, 613 F.3d at 1166 (finding claim that employer "increased [plaintiff's] workload to five to six times that of other employees" was retaliatory in combination with other conduct). As discussed above, Plaintiff does not sufficiently allege that her new workload extended her working hours or had any adverse effect on her besides making her

responsibilities drier, more tedious, and, correspondingly, less prestigious. See *supra* Section III.B.1. That is not enough to support a retaliation claim at this stage.

Likewise, district courts in this circuit have repeatedly held that the denial of training opportunities alone is not materially adverse action sufficient to support a retaliation claim. See, e.g., Dorns v. Geithner, 692 F. Supp. 2d 119, 133 (D.D.C. 2010); Walker v. Mattis, 319 F. Supp. 3d 267, 276 (D.D.C. 2018); Jimenez v. McAleenan, 395 F. Supp. 3d 22, 39 (D.D.C. 2019); Blackmon-Malloy v. United States Capitol Police Bd., 2024 WL 4298853, at *19 (D.D.C. Sept. 26, 2024). As discussed above, Plaintiff does not plausibly allege that missing the four Toastmasters meetings had any effect on her job — much less a material or significant one. See *supra* Section III.B.1. As with her discrimination claim, Plaintiff's allegations are therefore insufficient to support her ADEA and Title VII retaliation claims.

C. Dismissal With Prejudice

One final matter demands the Court's attention. Typically, it would dismiss a plaintiff's complaint for failure to state a claim without prejudice. See Coon v. Wood, 68 F. Supp. 3d 77, 82 (D.D.C. 2014). The Government, however, asks this Court for a with-prejudice dismissal, given that the current Complaint represents Plaintiff's fourth try. See MTD at 14–15. The Court will not indulge that request.

Dismissals with prejudice are strongly disfavored in this Circuit. They are the "exception, not the rule," so the standard for granting them is very high. Rudder v. Williams, 666 F.3d 790, 794 (D.C. Cir. 2012). As the Government itself acknowledges, the standard is met "only when the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." Id. (cleaned up). The deficiencies in Lewis's Third Amended

Complaint do not rise to that level. Plaintiff was proceeding *pro se* before, moreover, and the Complaint at issue is her first one with counsel.

## IV. Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: August 26, 2026